UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

SONYA WOLF; ROGER CRAIG
in his capacity as Guardian
ad Litem for the minor
NICHOLAS H.,

        Plaintiffs,

   v.

CITY OF STOCKTON; OFFICER
DARREN SANDOVAL, individually
and in his official capacity
as police officer for the City
of Stockton, et al.,

        Defendants.

NO. CIV. S-08-964 FCD/GGH

MEMORANDUM AND ORDER

----oo0oo----

    This matter is before the court on the parties' cross-motions for summary judgment, or alternatively, partial summary judgment in this action brought by plaintiff Sonya Wolf ("Wolf") on behalf of herself and her minor son, Nicholas H. ("Nicholas"), represented by Roger Craig in his capacity as Guardian ad Litem for Nicholas (collectively, "plaintiffs"). By this action, plaintiffs allege various civil rights violations, pursuant to 42 U.S.C. § 1983 ("Section 1983"), against defendants City of

1

1  Stockton (the "City"), Officer Darren Sandoval ("Sandoval") and
2  Officer Eric Azarvand ("Azarvand") (collectively, "defendants")
3  arising from the officers' response to and investigation of a
4  report of child neglect.  Officers responded to a report, by
5  Nicholas' father, that Nicholas was living with his mother in his
6  mother's van.  Plaintiffs allege the officers acted without legal
7  justification in detaining Wolf, searching Wolf's van[1] and
8  interviewing Nicholas.  Plaintiffs sue the City under <u>Monell v.</u>
9  <u>Department of Social Servs.</u>, 436 U.S. 658 (1978) which permits a
10 municipality to be held liable for damages under Section 1983
11 where the municipality itself causes the constitutional
12 deprivation.
13     Defendants move for summary judgment, arguing (1) plaintiffs
14 have no evidence of any constitutional violations by the
15 defendant officers because the officers' conduct was justified
16 under emergency aid exception to the warrant requirement;
17 (2) even if a constitutional violation could be established, the
18 officers are entitled to qualified immunity because they did not
19 act contrary to any clearly established law permitting child
20 welfare checks under these circumstances; and (3) plaintiffs have
21 no evidence of any formal governmental policy or longstanding
22 practice or custom of the City which violates plaintiffs'
23 constitutional rights.
24     In the amended complaint, plaintiffs alleged the officers
25 deprived them of (1) their right to liberty without due process

---

[1] While plaintiffs object to the "search" of Wolf's van, as set forth below, it is undisputed that the officers did not physically enter Wolf's van; rather, they opened the doors to the van to observe Nicholas.

2

of law; (2) their right to be free from unreasonable interference with a parent-child relationship; (3) the right to procedural due process; (4) the right to be free from arbitrary intrusions on plaintiffs' physical and emotional well-being; and (6) the right to be free from the use of excessive force.  (Am. Compl., filed July 19, 2009 [Docket #15].)  However, in opposing defendants' motion, brought against all of said claims, as well as in cross-moving for summary judgment, plaintiffs argue only that the officers' actions violated their Fourth Amendment rights to be free from unlawful search or seizure.  (Mem. of P. & A. in Supp. of Pls.' MSJ and in Opp'n to Defs.' MSJ, filed Jan. 19, 2010 [Docket #27].)  As such, the court finds based on plaintiffs' arguments that they have abandoned their other claims for relief pled in the amended complaint, including alleged violations of their substantive and procedural due process rights under the Fourteenth Amendment and their excessive force claim under the Eighth Amendment.  The court thus considers herein only whether the officers violated plaintiffs' Fourth Amendment rights.

    The court heard oral argument on the motions on February 26, 2010.  By this order, it now renders its decision, holding that there is no material issue of fact as to whether defendants violated plaintiffs' Fourth Amendment rights, and thus, summary judgment is properly granted in defendants' favor.  Because the court finds that plaintiffs' constitutional rights were not violated, it need not consider whether the individual defendants would otherwise be entitled to qualified immunity or whether plaintiffs could sustain a Monell claim against the City.

## BACKGROUND[2]

At around 9:00 p.m. on September 8, 2006, Wolf parked her van in a Denny's parking lot at 2670 West March Lane in Stockton, California. (UF #1.) Wolf testified she stopped at Denny's to take care of her dogs. (UF #2.)

On September 8, Officers Sandoval and Azarvand were partners in the same patrol car. (UF #3.) They were dispatched to the Denny's on March Lane because they received a report that a father had telephoned the police expressing concern over the welfare of his child, who the father said had been living in a van with his mother in the Denny's parking lot. (UF #s 4, 6; RDF #58.)[3] The father asked that police check on the welfare of his child. (Id.) The officers received a description of the vehicle as a white van with something about "flying dogs" on the outside of the van. (UF #5.)

---

[2] Unless otherwise noted, the court finds the following facts undisputed. (Pls.' Resp. to Defs. Stmt. of Undisp. Facts, filed Jan. 19, 2010 [Docket #22] ["UF"].) In support of their opposition and affirmative motion, plaintiffs submitted additional purported undisputed and disputed facts. (Id. ["DF"].) However, in large part, the court disregards these facts as they are immaterial to the motion for the reasons discussed below. (Defs.' Reply to Pls.' Stmt. of Facts, filed Feb. 11, 2010 ["RDF"].)

[3] As undisputed facts, defendants offered the following: "[They] were dispatched to the Denny's on March Lane for a person living in their car with a child" and the "reporting party was Wolf's ex-husband." (UF ¶s 4, 6.) At the hearing, however, defendants clarified that the officers knew the "person" allegedly living in her van with a child, was the mother of the child. Defendants also clarified that the officers knew the reporting party was the father of the child allegedly living in the van with his mother, and that the father had expressed concern about the child's welfare when he telephoned police, asking the police to check on his child. Plaintiffs did not dispute these facts at the hearing.

4

The officers found a van matching the description in the back of the Denny's parking lot. (UF #7.) To determine whether anyone was in the van, Officer Azarvand walked around the van knocking on parts of the van with his hand. (UF #8.) There was no response. (Id.) Wolf testified she heard the banging, saw it was the police, but did not respond because she was hoping they would go away. (Green Decl., filed Nov. 9, 2009, Ex. D, 31:8-25-32:1-7 [Docket #19-4].)

Officer Azarvand checked the doors and found the passenger door unlocked. He opened the door and asked Wolf to step out of the van; she promptly complied so that a dog would not jump out of the van. (UF # 9, 10.) The officers told Wolf they were there because they received a report of a child living in the van. (UF #11; RDF #35.) They asked Wolf if she had a child in the van, and she responded, yes. (UF #12.) The officers told Wolf they needed to check if the child was okay. (RDF #36.) The officers observed four dogs in the van; two in cages and two outside of cages. (UF #14.)

Wolf used her cell phone to make a call. (RDF #37.) She then tried to get to the front door of the van, pushing Azarvand twice in an attempt to close the door, but Azarvand stood in the way. (UF #13; RDF #s 38, 67.) Azarvand told Wolf that the officers were "in charge now." (RDF #39.) Wolf began screaming at Nicholas, telling him to close the van doors, lock them and not let the officers inside the van. (UF #15.) The officers then handcuffed Wolf and placed her in their patrol car. (UF

#16; RDF #s 40, 68.)[4]

Officer Azarvand took Wolf's van keys[5] and opened the back van doors to speak with the child, Nicholas. (UF #17.) Nicholas, who was seven at the time, was wearing pull-up diapers. (UF #19.) Azarvand observed Nicholas sitting on a little, thin mattress with a pillow and blanket, and he was concerned about him for sanitary and safety reasons. (RDF #60.)[6] The officers observed a pizza box in the back of the van. (UF #26).

Officer Azarvand began interviewing Nicholas. (UF #20.) Wolf objected to the interview, telling the officers they needed a warrant to search the van and to interview Nicholas. (RDF #s 53-55.) Wolf also told Azarvand that Nicholas' father makes false police reports about her. (RDF #61.) While Nicholas was being interviewed by Azarvand, Nicholas was able to see his mother sitting in the patrol car, which was a couple of yards away. (UF #s 21-22.)

---

[4] Azarvand did not believe that Wolf's momentary struggle with him rose to a level that she violated California Penal Code § 148 (resisting, delaying or obstructing a peace officer in the performance of his duties). (RDF #59.) Azarvand did not intend to arrest Wolf when he put her in the patrol car. (RDF #s 64-65.) The officers placed her in the car in order to facilitate the interview of Nicholas. (RDF # 70.)

[5] Wolf concedes she allowed Azarvand to take her van keys. She testified that, after the officers would not let her go and threatened to call Child Protective Services and Animal Control, she felt she had no choice but to comply with the officers' directions. (DF #s 44-47.) Defendants dispute that the officers acted in a threatening manner to Wolf but that dispute of fact is not material to the motion. (RDF #s 44-47.)

[6] Wolf testified that Nicholas was wearing pull-up diapers because it was late at night and he was still wetting the bed. She explained that Nicholas had a mattress and blankets to be comfortable as he watched a movie. (RDF #s 48-49.) Defendants do not dispute these facts. (Id.)

6

Nicholas told Azarvand he lived in the van but then said he sometimes stayed at his grandmother's house; he said, however, that even though his grandmother has a house, he and his mother still sleep in the van.  (UF #18, 23.)  In response to Azarvand's question whether Nicholas went to school, Nicholas replied that he went to "karate" three times a week.  (UF #s 24-25.)  The officers testified the interview of Nicholas lasted five minutes. (Green Decl., Ex A at 59:24-25, Ex. C at 47:11-12.)

At the scene, the officers telephoned Nicholas' father, who told Azarvand that he received the information from either his or Wolf's sister that Nicholas was living in Wolf's van at the Denny's parking lot.  The officers also called Wolf's mother who said Wolf and Nicholas lived with her.  (UF #s 27-28.)

After officers interviewed Nicholas, Wolf was released and returned to the van.  (UF #29.)[7]  While Azarvand believed it was unusual that Nicholas was in pull-up diapers, he did not believe it was a circumstance that rose to the level of an imminent danger.  (RDF #62.)  Nor did the officers observe any safety or sanitary risks in the van.  (RDF #63.)  The officers concluded that Nicholas appeared healthy and well cared for and they left the scene.  (UF #30.)  The entire incident lasted about one hour. (RDF # 73.)

///

///

---

[7] Wolf attests that at some point a third officer arrived on the scene, telling her that the officers would do anything, including ripping the door off the van, in order to talk to Nicholas.  Defendants dispute her testimony, claiming that no other officer responded to the scene.  (RDF #57.)  This factual dispute is not material to the motion.

7

**STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

When parties submit cross-motions for summary judgment, the court must review the evidence submitted in support of *each* cross-motion and consider each party's motion on its own merits. Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001). The court must examine each set of evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-289 (1968). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256 (1986).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See Falls Riverway Realty, Inc. v. City of Niagara Falls, 754 F.2d 49, 57 (2d Cir. 1985); Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

**ANALYSIS**

**1.   Constitutional Claims**

Plaintiffs argue defendants violated their Fourth Amendment rights in searching Wolf's van and seizing plaintiffs without a warrant. According to plaintiffs, a report of a mother living with her child in a van does not present such an emergent situation to justify the officers' conduct in this case. Importantly, plaintiffs conceded at oral argument that the officers had a duty to investigate the father's report and locate the van in order to check on the welfare of the child. However, they contend that once Wolf refused to cooperate, the officers should have ended their investigation and sought a warrant before proceeding any further.

Defendants argue, to the contrary, that they not only had an obligation to respond to the father's report and locate the van

9

but they had a further obligation, particularly considering Wolf's uncooperative and obstructive behavior, to fully investigate the situation to confirm the child's safety. Defendants contend their conduct was specifically justified under the emergency aid exception to the Fourth Amendment's warrant requirement.

The Ninth Circuit first recognized this exception in <u>United States v. Cervantes</u>, 219 F.3d 882 (9th Cir. 2000). There, the court concluded that the emergency doctrine justified an officer's entry into an apartment to investigate a chemical odor consistent with methamphetamine production. <u>Id.</u> at 891. The court applied the doctrine because the officer reasonably believed that there was an emergency requiring his immediate assistance due to the risk of explosion created by methamphetamine labs. <u>Id.</u> In addition, the court concluded that his entry was not motivated by the desire to collect evidence, and that there was a reasonable basis to associate the apartment searched with the emergency. <u>Id.</u>

The court explained that the emergency doctrine is derived from police officers' community caretaking function. A function that had long been recognized by the United States Supreme Court. In <u>Mincey v. Arizona</u>, 437 U.S. 385 (1978), the Court acknowledged the right of the police to respond to emergencies, reasoning that entry or search that would otherwise be barred by the Fourth Amendment may be justified by the need to protect life or avoid serious injury. <u>Id.</u> at 392.

Thus, in <u>Cervantes</u>, the Ninth Circuit adopted a three prong test for determining whether the emergency aid exception is

10

applicable to a particular set of circumstances: (1) the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property; (2) the search must not be primarily motivated by the intent to arrest and seize evidence; and (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched. Cervantes, 219 F.3d at 888-90.

Here, the officers had reasonable grounds to believe there existed an immediate need for their assistance. This case is simply not about a child living in a van with his mother, as plaintiffs argue. The officers were acting upon a report by a child's father, who was concerned about his child's safety and welfare in light of the fact that the father believed his child was living in a van with his mother at a restaurant parking lot. The father's report of suspected child neglect contained specific information, describing the van and its location. The officers found the van matching the father's description in the exact location reported by the father.

Immediately upon approaching the van, the officers' suspicions and concerns for the child's welfare were heightened by Wolf's bizarre conduct. At first, while in the van, Wolf was wholly unresponsive to the officers' inquiries. Once out of the van, she was obstructive to any efforts by the officers to check on the child. She physically blocked the officers from the van. She then began screaming at Nicholas to lock the doors and not let the officers inside the van. As a result, the officers had to restrain her in order to check on the child. Such behavior by

11

Wolf supported the officers' reasonable belief that "they had a duty under the community caretaking function to investigate a potential emergency situation." Martin v. City of Oceanside, 360 F.3d 1078, 1082 (9th Cir. 2004) (holding the same where officers responded to a father's phone call that his adult daughter may be "urgently" "in trouble" inside her home; officers went to the home and found the daughter's and her companion's cars in the driveway, their neighbors reported that the two should be home, the officers knocked but there was no response and the daughter did not pick up the phone when the officers called the house).[8]

    Second, the officers' seizure of plaintiffs and search of the van was not motivated by an intent to arrest or to seize evidence. At no time did the officers intend to arrest Wolf or tell her that she was going to be arrested, and Wolf was not, in fact, arrested. It became necessary to detain Wolf in order to conduct even a cursory interview of Nicholas. Moreover, the officers opened the van doors and made certain visual observations, but they did not enter the van or search any part of the van or gather any physical evidence whatsoever. Once the officers determined that Nicholas was safe, they released Wolf and left Nicholas in his mother's care. The entire incident was

---

[8] In Martin, after receiving information from a neighbor that the daughter and her companion were likely in the home, the officers entered the house through the garage with their flashlights on and guns drawn. The officers checked the downstairs, found no one, and then proceeded up the stairway to the second floor. When they got to the top of the stairs, the daughter exited a bedroom at the other end of the hallway. The officers requested that she identify herself, and after a short argument about the officers not having a warrant, she produced identification. The officers confirmed she was safe, and left the house shortly thereafter. Id. at 1081.

12

brief, lasting only approximately an hour.[9]  See id. (finding this prong of the test met where once the officers verified the daughter's identity and saw that she was not in trouble, they left the residence immediately).

Finally, the officers had a reasonable basis for associating a potential emergency with Wolf's van.  As discussed above, the van was found in the exact location reported by Nicholas' father, and his description of Wolf's vehicle matched the van found in the parking lot.  Upon initially contacting Wolf, she was obstructive and combative, screaming at Nicholas to "lock the doors" and keep the officers out of the van.  The officers observed four dogs in the van, two in cages and two outside of cages; after opening the van doors, the officers observed food items in the van and Nicholas in diapers, sitting on a thin mattress.

Also, in order to satisfy this third prong of the test, an officer's search must to be limited to only those areas necessary to respond to the perceived emergency.  Such is clearly the case here as officers only opened the back van doors to speak with Nicholas briefly.  There is no evidence the officers entered the van; Nicholas could see his mother at all times; they briefly asked Nicholas questions limited to his well being and attempted to verify his responses by calling his grandmother and father.  The officers did no more than reasonably necessary to confirm Nicholas' safety.  Id. (finding where the officers did no more than search the areas of the daughter's home where she could

---

[9] Undoubtedly, the reason the incident took that long was Wolf's obstructive behavior.

13

potentially be located, this prong of the test was satisfied).

Plaintiffs' arguments to the contrary are unavailing. First, contrary to plaintiffs' protestations, the officers do not have a legal obligation to investigate the reporting father before performing a welfare check on his child. Id. (noting no obligation to investigate the father who called the police department to request a check on the safety of his adult daughter). Thus, plaintiffs' proffered evidence concerning alleged, previous false reports by Nicholas' father against her; Nicholas' father's alleged violations of his supervised visitation rights for Nicholas; and Wolf's prior lawsuits against the county for the improper removal of Nicholas from her home are irrelevant to the motion. (DF #s 31-34.) The officers had *no knowledge* of these matters prior to the incident, and they had no duty to obtain such information before responding to a father's request to check on his child's welfare.

Moreover, the Ninth Circuit has specifically applied the emergency aid exception in a case involving a child's welfare. In United States v. Bradley, 321 F.3d 1212 (9th Cir. 2003), officers received information from an arrested 9 year old's mother that the child was home with a friend. Officers went to the home and no one answered their knocks. They then received information from the mother that the child was actually with a neighbor. The officers went to the neighbor's house, and the neighbor told the officers he did not have the child. The officers then went back to the boy's house and knocked again with no answer. They found a door unlocked and went inside, and found the child alone but safe. The court validated the search under

14

the emergency aid exception set forth in Cervantes.  Id. at 1215 (holding these facts supported the district court's finding that the officers' entry into the home was motivated by a concern for the child's welfare and thus, was lawful).  Such is similarly the case here.  The record adequately reflects that the officers acted out of a genuine concern for Nicholas' welfare.

Likewise, White v. Pierce County, 797 F.2d 812 (9th Cir. 1986), is a factually analogous case, which although it pre-dates Cervantes, is nonetheless persuasive authority since the court recognized that the *exigent* circumstances justified the warrantless entry into a home to investigate a report of suspected child abuse.  There, deputies were dispatched to investigate a report that a 7-year old child had been seen playing in his yard without his shirt on, and he was observed with severe welts on his back.  Upon arrival at the home, the deputies told the father of the report of abuse and asked to examine the son.  The father refused, stating the deputies needed a warrant or court order.  The child attempted to show the deputies his back, but the father ordered him not to and to go to another room.  The deputies insisted on examining the child's back, believing based on the father's conduct, that the child was being abused and would be injured further if not removed from the residence immediately.  The father became violent and abusive.  The deputies attempted to enter the house, and the father assaulted them; the deputies then forcibly subdued and handcuffed the father.  They then entered the house and examined the child.  They found no signs of abuse.  The father was arrested and charged with assault and interfering with a police officer.

15

The Ninth Circuit found the search lawful, affirming the district court's finding of qualified immunity based on the facts that the officers had probable cause to believe the boy was being abused and exigent circumstances[10] justified the warrantless entry into the home. Id. at 815-816.

Here, based on the above case law and the facts in this case, the court finds that the officers' warrantless search and seizure in this case falls squarely within the emergency aid exception and community caretaking function. As in Martin, this case involved a "reasonable reques[t] that prompted police to fulfill their responsibility to investigate potentially suspicious activity and protect the communities they serve." Id. at 1083. Therefore, the court finds the emergency aid exception applicable, and its elements met, and thus it cannot find any constitutional error in the officers' actions in this case. Defendants' motion for summary judgment must accordingly be GRANTED.

**2.   Qualified Immunity**

Defendants, alternatively, move for summary judgment on the ground of qualified immunity. Public officials are entitled to

---

[10]   It is these exigent circumstances which distinguish White and this case from Calabretta v. Floyd, 189 F.3d 808 (9th Cir. 1999), also a case pre-dating Cervantes but raising some similar issues. Calabretta, however, is distinguishable, as there the court found an "absence of emergency"--there was no exigent circumstances where the social worker and officers delayed entry into the home for fourteen days after the report of suspected child abuse. The court found that clearly there was no perceived immediate danger of serious harm to the children. This court has found to the contrary in this case. Considering the nature of Nicholas' father's report and Wolf's combative and obstructive conduct, the officers reasonably perceived an emergent situation.

16

qualified immunity for acts that do not violate "clearly established . . . constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Ultimately, where a defendant's conduct violates constitutional rights and the law is clearly established, the defendant may not claim qualified immunity.

Here, for the reasons set forth above, the court has addressed the "threshold" inquiry under the qualified immunity analysis and finds that there is no triable issue of fact that plaintiffs' Fourth Amendment rights were violated by the officers' conduct in responding to and investigating the report of child neglect. Pearson v. Callahan, 129 S. Ct. 808 (2009); Saucier v. Katz, 533 U.S. 194, 201 (2001). As such, the court need not make the second inquiry under the qualified immunity analysis to determine whether the relevant law was clearly established. Martin, 360 F.3d at 1082 (finding that because the "emergency aid" exception applied, there was no "actua[l]" violation of a constitutional right and thus, the analysis under Saucier properly ended at the first step). Because there is no constitutional violation, qualified immunity is not at issue.

**3.   Monell Liability**

Because plaintiffs have not established a constitutional violation, there can be no municipal liability. It is well-established that a public entity cannot be held liable where there is no underlying constitutional violation by its employees. Long v. City and County of Honolulu, 511 F.3d 901, 907 (9th Cir. 2007) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)) (holding that where there was no constitutional violation

17

of plaintiff Long's rights by the defendant officers, there was "no basis for finding the officers inadequately trained" to establish liability under Monell).  Similarly, here, plaintiffs base their Monell claim on the allegation that the City improperly trained its officers to respond to a report of child neglect.  Because the court finds no constitutional error by the officers, it must also find that plaintiffs cannot establish a Monell claim against the City.  Id.

## CONCLUSION

For the foregoing reasons, the court GRANTS defendants' motion for summary judgment.  Plaintiffs' cross-motion for judgment in their favor is accordingly DENIED.  The Clerk of the Court is directed to close this file.

IT IS SO ORDERED.

DATED: March 4, 2010

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE